```
         IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA


LONNIE DAVIS,                      :
         Plaintiff,                :
                                   :
    v.                             :   Civil Action No. 14-4300
                                   :
THOMAS JEFFERSON UNIVERSITY        :
         Defendant.                :
```

## MEMORANDUM AND ORDER

**Joyner, J.**                                                **July 8, 2015**

This discrimination action has been brought before the Court on motion by the Defendant for summary judgment. For the reasons which follow, the motion shall be granted.

### History of the Case

Plaintiff, Lonnie Timothy Davis, was employed by Defendant, Thomas Jefferson University from September 1991 until his termination on July 18, 2011.[1] Prior to serving in his position as a Cage Wash Attendant, Plaintiff was employed by Thomas Jefferson University Hospital as Locker Room Attendant from March 22, 1988, until September 9, 1991. During most of his career at Thomas Jefferson University, Plaintiff was a member of local union, District 1199C, in affiliation with the National Union of Hospital and Health Care Employees. The union and Defendant entered into a Collective Bargaining Agreement that covers all

---

[1] Plaintiff was hired by Defendant in September 1991 as a Laboratory Glass Washer and served in that position for seventeen years. On July 2, 2007, Plaintiff moved from being a Laboratory Glass Washer to working as Cage Wash Attendant. Plaintiff held that position until his termination. *See* Exhibit "B" to Defendant's Motion for Summary Judgment, at 23:10-24:7; 24:13-22.

employees of Defendant who are also union members, including Plaintiff.

On or about December 2, 2010, Plaintiff aggravated a previous ankle injury when he twisted his left ankle while coming down the steps at his home. On December 22, 2010, Dr. Karanjia at the Rothman Institute treated Plaintiff for his injury. During this visit, Plaintiff was instructed to wear a lace-up brace for four weeks, and to be re-evaluated on January 9, 2011. On December 9, 2010, Plaintiff requested medical leave pursuant to the Family and Medical Leave Act for the injuries he sustained on December 2, 2010.

In response to his request, Plaintiff received notice dated December 13, 2010, informing him of his eligibility for medical leave. This notice advised Plaintiff of his responsibility to submit sufficient certifications for determination as to whether his absence qualified for FMLA leave. Dr. Karanjia returned the certification advising the Defendant that Plaintiff was treated on December 22, 2010, and would be unable to work for one month.

Plaintiff's FMLA leave was approved for four weeks beginning December 22, 2010, and ending January 21, 2011. On or about December 27, 2010, Plaintiff requested clearance to return to work, despite being on medical leave. Plaintiff was granted

clearance to return to his position, and worked from December 27, 2010, until January 7, 2011, before not returning.[2]

On February 3, 2011, Plaintiff applied for an additional 30-day FMLA leave to begin on January 23, 2011.  Plaintiff's second request was filed after he received a letter from his manager requesting an update on his intent to return to his position as he was out on an unauthorized leave since January 23, 2011.  Plaintiff was required to submit another certification from his treating physician stating the reason for his continued leave.  Plaintiff did not comply with this requirement in the specified time, therefore, his request for leave was denied on March 2, 2011.  Following this denial, Plaintiff returned to Dr. Karanjia's office on March 7, 2011, for treatment.[3]  After this visit, Dr. Karanjia submitted a certification to accompany Plaintiff's second request for FMLA leave.  Dr. Karanjia sent notice to Defendant that Plaintiff was to remain out of work from March 7, 2011 until his follow-up appointment on March 21, 2011.  Plaintiff's FMLA leave was subsequently approved for the dates requested by Dr. Karanjia; however, his absences from January 23, 2011 to March 6, 2011, remained unauthorized.

---

[2] From January 10, 2011 – January 26, 2011, Plaintiff called out for reasons unrelated to his ankle injury.
[3] Plaintiff was initially scheduled for a follow-up appointment with Dr. Karanjia on January 9, 2011; however, he did not go to the appointment.  On March 4, 2011, Plaintiff was examined by Dr. Shannon at the Ankle & Foot Center and Penn Presbyterian Medical Center.  There is no showing in the record that Plaintiff was treated for his ankle injury between December 22, 2010 and March 7, 2011.

3

Plaintiff's care was transferred to Dr. Raikin, a surgeon at the Rothman Institute, who performed surgery on Plaintiff's ankle on May 3, 2011.  Relying on the documentation provided by Plaintiff's treating physicians, the Defendant extended his FMLA leave until April 27, 2011.  Pursuant to the guidelines of the Family and Medical Leave Act, Plaintiff's 12-week leave expired on April 27, 2011.  Any subsequent leave required by Plaintiff was to be taken under the Defendant's Medical Leave of Absence policy.  Plaintiff remained out of work from January 7, 2011, until his termination on July 18, 2011.  Plaintiff is now receiving early retirement benefits through the union.

After filing claims with the Pennsylvania Human Relations Commission and the Equal Employment Opportunity Commission, Plaintiff requested a right to sue letter.  Plaintiff received notice of his right to sue on April 15, 2014 and, thereafter, initiated this action for disability discrimination alleging that: (1) he is a "qualified individual with a disability" as defined by the Americans with Disabilities Act, 42 U.S.C. §12102, *et. seq.* ("ADA"); (2) that he has a "non-job related handicap or disability" as defined by the Pennsylvania Human Relations Act, 43 P.S. § 954(p), *et. seq.* ("PHRA"); (3) he made a reasonable request for accommodation, which the Defendant denied, and/or refused to act upon as required under the ADA; and, (4) Defendant acted in bad faith when it unlawfully retaliated against

4

Plaintiff as the motivation for terminating Plaintiff was causally connected to his disability and FMLA leave.  Defendant now moves for entry of summary judgment in its favor on all four counts of the Plaintiff's complaint.

Legal Standard for Summary Judgment

Summary Judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The standard set forth in the Federal Rules of Civil Procedure provides that "the mere existence of some alleged factual dispute between parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis omitted).  An issue is material when "a reasonable jury could return a verdict for the non-moving party.  Id. at 248.

In considering a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and all reasonable inferences must be drawn in favor of the non-moving party.  Id. at 255; NAACP v. North Hudson Regional Fire & Rescue, 665 F.3d 464, 475 (3rd Cir. 2011).  Once the moving party has met the initial burden of demonstrating the

5

absence of a genuine issue of material fact, the non-moving party must establish the existence of each element of its case by setting forth "specific facts" showing there is a genuine issue. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); North Hudson Regional Fire & Rescue, supra.  When the facts presented in the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial," and summary judgment is proper.  North Hudson Regional & Fire Rescue, supra (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## Discussion

A. Disability Discrimination under the Americans with Disabilities Act of 1990, as amended, and the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963, *et. seq.*

**1. Plaintiff as a "qualified individual" under the ADA and PHRA**

The purpose of the ADA is to "prevent otherwise qualified individuals from being discriminated against in employment based on disability." Turner v. Hershey Chocolate USA, 440 F.3d 604, 607 (3rd Cir. 2006) (following the EEOC guidelines for interpreting the ADA, 29 C.F.R. § 1630.2).  The Supreme Court has observed that the ADA "seeks to diminish or to eliminate the stereotypical thought processes, the thoughtless actions, and the hostile reactions that far too often bar those with disabilities from participating fully in the Nation's life, including the workplace."  42 U.S.C. § 12101; U.S. Airways, Inc. v. Barnett,

535 U.S. 391, 401 (2002). Plaintiff's complaint in this case avers that his rights under both the federal ADA statute and the state PHRA were violated when the Defendant terminated his employment while on medical leave for a severe ankle sprain. (Plaintiff's Amended Complaint). Under the ADA, 42 U.S.C. §12112(a),

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

Section 955(a) of the PHRA recognized that it is "unlawful discriminatory practice, . . ."

> [f]or any employer because of race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required . . . Notwithstanding any provision of this clause, it shall not be an unlawful employment practice for a religious corporation or association to hire or employ on the basis of sex in those certain instances where sex is a bona fide occupational qualification because of the religious beliefs, practices, or observances of the corporation or association.

The Third Circuit has recognized that the PHRA is "basically the same" as the ADA "in relevant respects and Pennsylvania courts . . . generally interpret the PHRA in accord with its

7

federal counterparts." Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3rd Cir. 2002) (quoting Kelly v. Drexel Univ., 94 F.3d 102, 105 (3rd Cir. 1996)).

In order for the Plaintiff to prevail in his case in chief for disability discrimination under the ADA, he must show that he (1) has a "disability" or is "regarded as" having a "disability," (2) is otherwise a "qualified individual" able to perform his essential job duties, and (3) has suffered an adverse employment action because of that disability. Turner, 440 F.3d at 611; Shaner v. Synthes, 204 F.3d 494, 500 (3rd Cir. 2000)(quoting Gaul v. Lucent Techs. Inc., 134 F.3d 576, 580 (3rd Cir 1998)). It has been acknowledged in Plaintiff's Opposition to Defendant's Motion for Summary Judgment that the first and third elements are not in dispute. Therefore, the court will focus its analysis for determination on the second element and consider whether Plaintiff is a "qualified individual" under the ADA.

A "qualified individual" is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Courts are to consider the "employer's judgment as to what functions of a job are essential." Id. The second prong of this test for disability discrimination burdens the Plaintiff with showing that he is a "qualified individual." Buskirk v. Apollo Metals, 307 F.3d 160, 168 (3rd Cir. 2002). In

the past, the Third Circuit has used a two-part test when determining whether someone is a "qualified individual." 29 C.F.R. § 1630.2(m). Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3rd Cir. 1998). The first part of this test requires the Plaintiff to show, and the court to consider, whether (1) he "satisfies the requisite skill, experience, education and other job-related requirements" of his position; and (2) "with or without reasonable accommodation, can perform the essential functions of such position." Id. (following the EEOC guidelines for interpreting the ADA, 29 C.F.R. § 1630.2(m)).

In application of the preceding principles to the case at hand, we find that Plaintiff successfully meets the criteria of the first part of this two-part test. The record shows that Plaintiff possessed the level of skill required to perform his job duties. Plaintiff testified that he was employed as a Cage Wash Attendant for four years prior to his termination in July 2011, and was employed by the Defendant for a total of twenty-one years. (See Exhibit "B" at 23:10-24:22 of Defendant's Motion for Summary Judgment). There is no showing in the record that at any time during his employment, prior to his FMLA leave in December 2010, that Plaintiff was cited for his inability to perform his duties. In fact, there were moments during his employment where he received letters of recommendation for "outstanding work performance." (Id. at 25:14-21). Plaintiff's position as a Cage

9

Wash Attendant required neither specialized knowledge nor a specified level of education. Therefore, Plaintiff satisfies the first part of this test.

The second part of the test requires a showing that Plaintiff was able to perform his "essential job functions," with or without "reasonable accommodation." The regulations define an "essential job function" as the "fundamental job duties" and not "the marginal function of the position." 29 C.F.R. § 1630.2(n)(1); Skerski v. Time Warner Cable Co. a Div. of Time Warner Entertainment Co. L.P., 257 F.3d 273, 279 (3rd Cir. 2001). The Third Circuit acknowledged that:

> [t]he regulations list several factors for consideration in distinguishing the fundamental job functions from the marginal job functions, including: (1) whether the performance of the function is the reason the position exists; (2) whether there are a limited number of employees available among whom the performance of that job function can be distributed; and (3) whether the function is highly specialized so that the incumbent in the position is hired for his or her expertise.

Skerski, 257 F.3d at 279 (quoting the EEOC regulations for interpretation of the ADA, 29 C.F.R. § 1630.2(n)(2))(internal quotations omitted).

The regulations further provide a list of examples "designed to assist a court in identifying the essential functions of a job." Id. These examples include:

> (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before

>   advertising or interview applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) the consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the jobs; and/or (vii) The current work experience of incumbents in similar jobs.

Id.; 29 C.F.R. § 1630.2(n)(3).

Any factual determination made must be done on a case-by-case basis, as none of these factors alone is determinative. Id. However, should evidence be produced pointing to one of these factors, then consideration shall be given. Id.

The "reasonable accommodations" requirement bestows upon the employer the duty to engage in the interactive process by assisting and communicating with the employee in good faith. Williams v. Philadelphia Housing Authority Police Dept., 380 F.3d 751, 761 (3d Cir. 2004). Pursuant to the regulations, accommodations can include "[j]ob-restructuring; [allowing] part-time or modified work schedules; [or,] reassignment to a vacant position." 29 C.F.R. § 1630.2(o).

Applying the preceding principles to the case at hand, we find that Plaintiff does not satisfy the second part of this two-part test. Plaintiff's primary reliance on Dr. Raikin's communication with Defendant is not enough to show a genuine issue of material fact.[4] First, pursuant to Article 10 of the

---

[4] Dr. Raikin informed Defendant that plaintiff would be able to return to his position at TJU on July 18, 2011, provided that he would be able to perform sedentary work until July 27, 2011, at which time he would be able to return to full-duty.

11

Collective Bargaining Agreement ("CBA") between local union 1199C and the Defendant, the maximum time for unpaid leave is six months.  (See Exhibit "C" at Article 10 of Defendant's Motion for Summary Judgment).  The record reflects that Plaintiff's first month on FMLA leave was approved on December 22, 2010; however, Plaintiff worked from December 27, 2010 until January 7, 2011.  (See Exhibits "Q" and "S" of Defendant's Motion for Summary Judgment).  The record also reflects that Plaintiff did not return to his position after January 7, 2011, with his six-month leave beginning on January 10, 2011 and ending on July 10, 2011.  (Exhibit "SS" of Defendant's Motion for Summary Judgment).  During his leave, Defendant kept Plaintiff fully informed of his rights and responsibilities under both FMLA provisions and Jefferson's Leave of Absence Policy.  (See Exhibits "M;" "S;" "T;" "U;" "V;" "Z;" "CC;" "EE;" "FF;" "II;" and "KK" of Defendant's Motion for Summary Judgment).  The meeting between Plaintiff and Defendant on July 8, 2011, was to learn of Plaintiff's intent to return to work and need for accommodation under the ADA.  (See Exhibits "QQ;" "RR" of Defendant's Motion for Summary Judgment).  During this meeting, Plaintiff stated outright that he did not intend to return to his position as a Cage Wash Attendant at TJU and refused accommodation.  (See Exhibit "B" at 59:14-61:20).  Despite Plaintiff's remarks, Defendant extended him additional time to inform them as to when

12

he would be able to return to his position.  (Id. at 58:2-59:13). Defendant waited until July 18, 2011, Plaintiff's expected return to work date, before forwarding his termination letter.  (See Exhibits "PP;" "VV" of Defendant's Motion for Summary Judgment). Plaintiff's termination came ten days after his meeting with Defendant's human resources personnel, and eight days after the expiration of his six-month leave pursuant to the CBA.  (See Exhibits "RR;" "SS" of Defendant's Motion for Summary Judgment). Plaintiff did not return to work on July 18, 2011.  Instead, he called his department on July 13, 2011, and informed Defendant that he was instructed to have 18 – 24 physical therapy sessions, and that his physician, Dr. Raikin, was going to inform the department of his return to work date.  (See Exhibit "TT" of Defendant's Motion for Summary Judgment).  This information provided by Plaintiff contravenes the medical update Defendant received from Dr. Raikin on June 28, 2011.  (See Exhibits "OO;" "PP" of Defendant's Motion for Summary Judgment).  The record reflects that Plaintiff attended one physical therapy session before being discharged from the program for failure to show. (See Exhibit "UU" of Defendant's Motion for Summary Judgment).

    Second, Defendant was under no duty to abandon the terms of its Collective Bargaining Agreement for the sake of the Plaintiff.  The Third Circuit acknowledged that "a covered entity cannot avoid its ADA duties by contractual manipulation;"

13

however, the ADA also "does not require that collectively bargained seniority rights be compromised in order to reasonably accommodate a disabled individual." Kralik v. Durbin, 130 F.3d 76, 82 (3rd Cir. 1997)(quoting Eckles v. CONRAIL, 94 F.3d 1041, 1046 (7th Cir. 1996).  The Third Circuit established that an accommodation to one employee which infringes on the rights of another employee is not reasonable.  Id. at 83.

For the reasons set forth above, we find that Plaintiff did not establish that he is a qualified individual under the ADA. Although Plaintiff has the training and skill required to be a Cage Wash Attendant, at the time of his termination, he was unable to perform his essential job functions, and denied offers for reasonable accommodation.  An extension of his six-month leave would have been a violation of the Collective Bargaining Agreement, and therefore unreasonable.  It is important to note that Plaintiff's six-month medical leave expired on or about July 10, 2011, and Defendant granted him until July 12, 2011, to inform his department of his intent to return.[5]  Additionally, Defendant waited until July 18, 2011, to send Plaintiff notice of his termination after he did not report to work as expected. Therefore, Plaintiff, at the time of his termination, was not a qualified individual as required by the ADA.

---

[5] The record reflects that Plaintiff's leave expired on either July 7, 2011, or July 10, 2011.  See Exhibit "RR" of Defendant's Motion for Summary Judgment.

2. Defendant's Duty to Provide Reasonable Accommodation and Engage in the Interactive Process.

To show that an employer failed to engage in the interactive process or find reasonable accommodations under the ADA, a Plaintiff must demonstrate: 1) the employer knew about his disability; 2) he requested accommodations or assistance for his disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith. Taylor v. Phoenixville School Dist., 184 F.3d 296, 319-20 (3rd Cir. 1999). The Third Circuit has held that "both the employer and employee have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." Williams, 380 F.3d at 771. Furthermore, an employee cannot recover in such a claim without showing that the requested accommodation was possible. Id. at 772. An employer who "acts in bad faith [during] the interactive process will be liable if the jury reasonably concludes that the employee would have been able to perform the job with accommodations." Id. (quoting Taylor, 184 F.3d at 317) (emphasis omitted).

Plaintiff alleges that extending his Jefferson Medical Leave by nine days, and allowing him to return on July 27, 2011, would have been a reasonable accommodation as it is within the employer's discretion to grant such an extension. We find that

15

an extension of the six-month term for leave would have required the Defendant to violate its Collective Bargaining Agreement.  In his deposition testimony, Randy McLaughlin, Manager of Employee Relations, stated that the purpose of the meeting with Plaintiff on July 8, 2011, was to assess his intent to return and to inquire as to any accommodation he may require.  (Exhibit "D" at 122:2-123:23 of Defendant's Motion for Summary Judgment).  After the meeting, Plaintiff was granted an additional four days to inform Defendant of his intent to return, despite his assertion that he did not intend to return to his position, and that the determination would be made by Dr. Raikin.[6]  Mr. McLaughlin agreed that an extension of an employee's medical leave beyond the six-months allowed under the CBA could be a reasonable accommodation under the ADA; however, such an extension is subject to Union approval and he had never heard of such a thing happening in the union's 40-year history.  (Id. at 122:24-123:23).  The Third Circuit held, and we agree, that an extension of the leave policy for one employee can be unfair to the other members and can potentially result in the employer facing consequences.  Kralik, 130 F.3d at 83.

  A. Proscriptive Violation of FMLA Rights

---

[6] During his deposition, plaintiff testified that his unwillingness to return to his position was out of anger as he felt that Jefferson had the duty to transfer him after he alerted them, at the meeting, that he was being harrassed by a co-worker.  Given the timeline of events, the court does not find that this issue is connected with Plaintiff's disability discrimination claim.

The purpose of the FMLA is to "balance the demands of the workplace with the needs of families," and "to entitle employees to take reasonable leave for medical reasons." 29 U.S.C §260(b)(1), (2); *Budhan v. Reading Hosp. and Medical Center*, 765 F.3d 245, 251 (3rd Cir. 2014). Employers are required to provide an employee with a maximum of twelve weeks of leave and face liability if they retaliate against an employee for reasons associated with his or her medical leave. 29 U.S.C. § 2615(a)(1); 29 C.F.R § 825.220(c). The relevant section of the Family and Medical Leave Act prohibits employers from discharging or discriminating against any employee who has used FMLA leave. 29 C.F.R. § 825.220(c); Erdman v. Nationwide Ins. Co., 582 F.3d 500, 508 (3rd Cir. 2009).

There are two distinctive provisions contained within the FMLA. First, it creates prescriptive or substantive rights for eligible employees, allowing for a maximum leave of twelve weeks, with the right to be reinstated to their position. 29 U.S.C. § 2612(a)(1)(D); Callison v. City of Philadelphia, 430 F.3d 177, 119 (3rd Cir. 2005); Churchill v. Star Enters, 183 F.3d 184, 192 (3rd Cir. 1999). Second, the FMLA protects employees against potential discrimination when exercising their "proscriptive" FMLA rights. See 29 U.S.C. § 2615(a)(1), (2); 29 C.F.R. § 825.22(c); Callison, supra. A violation of these rights

generally will result in "retaliation" or "discrimination" claims. Id. Retaliation claims arise when an employee has exercised his right to FMLA leave under the statute, and is subsequently discharged from employment. These claims are based on the premise that the rights established by the FMLA are to prevent employers from discriminating against employees who take leave. Hodgens v. General Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998). To succeed on a retaliation claim, Plaintiff must show: (1) he is protected under FMLA; (2) he suffered an adverse employment action; and (3) the adverse employment action was casually connected to the reason for Plaintiff's leave. Erdman, 582 F.3d at 508, 509 (noting that the first element for retaliation claims, "connote invocation of FMLA rights and not actual commencement of leave."); see also Conoshenti v. Public Service Electric & Gas Co., 364 F.3d 135, 146 (3rd Cir. 2004).

In application of the foregoing principles, Plaintiff failed to show the causal connection between the reason for his FMLA leave and his termination. Plaintiff's FMLA leave expired on April 27, 2011, and he remained out of work on non-FMLA leave until his termination on July 18, 2011. Plaintiff alleges that his termination was a result of his inability to return to work prior to being medically cleared by his physician, and that his termination was a direct result of Defendant's refusal to consider his request for sedentary work or to extend his

employer-granted medical leave by nine days. The timing between the end of Plaintiff's FMLA leave and his termination is too attenuated for there to be a causal connection. The first element for a retaliation claim requires the employee to be covered under the FMLA provisions. At the time of his termination, Plaintiff was no longer covered under FMLA guidelines, but rather by Defendant's leave of absence policy pursuant to the CBA. See Conoshenti, 364 F.3d at 135(affirming the district court's ruling that Plaintiff's discharge was not due to his FMLA leave but to his violation of the employer's Last Chance Agreement (LCA) and extended non-FMLA leave); See also Abramson v. William Patterson College of New Jersey, 260 F.3d 265, 288 (3rd Cir. 2001)(stating that the Third Circuit has considered both timing and evidence of ongoing antagonism when determining retaliation claims).

B. Conclusion

When viewed in a light most favorable to the Plaintiff, this court agrees with the Defendant that Plaintiff failed to present evidence that his termination was more likely than not a result of discrimination. The record indicates that Defendant provided Plaintiff with adequate notice during his leave and kept him fully informed of all deadlines with which he was required to comply. Plaintiff's continued absence from work, after the exhaustion of his FMLA leave and in violation of the CBA, was the

substantial factor in the Defendant's decision to terminate him on July 18, 2011.  Accordingly, we shall grant the Defendant's motion for summary judgment.

    An order follows.